UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

LISA M. HUDSON,

                                        Plaintiff,

        v.

                                                        1:04-CV-1448
COMMISSIONER OF SOCIAL                                   (J. Kahn)
SECURITY,

                                        Defendant.
_____

APPEARANCES:                            OF COUNSEL:

STEPHEN J. MASTAITIS, JR.,ESQ.
Attorney for Plaintiff

GLENN T. SUDDABY                        WILLIAM H. PEASE
United States Attorney for the          Assistant U.S. Attorney
 Northern District of New York
Attorney for Defendant

GUSTAVE J. DI BIANCO, Magistrate Judge

## REPORT-RECOMMENDATION

        This matter was referred to me for report and recommendation by the Honorable

Lawrence E. Kahn, United States District Judge,  pursuant to 28 U.S.C. § 636(b) and

Local Rule 72.3(d).  This case has proceeded in accordance with General Order 18.

## PROCEDURAL HISTORY

        Plaintiff filed an application for Supplemental Security Income (SSI) and

disability benefits on June 6, 2003. (Administrative Transcript ("T") at 24).  Plaintiff's

claim was denied on August 18, 2003. (T. 28).

Plaintiff requested a hearing before an Administrative Law Judge ("ALJ") which was held on July 28, 2004. (T. 235-257). The ALJ found that plaintiff was not disabled. (T. 13-18). The ALJ's decision became the final decision of the Commissioner when the Appeals Council denied plaintiff's request for review on November 24, 2004. (T. 4-6).

## CONTENTIONS

The plaintiff makes the following claims:

(1) The ALJ's decision to discredit plaintiff's complaints of pain is not supported by substantial evidence in the record. (Brief at 4-6)[1].

(2) The ALJ failed to follow the Treating Physician Rule in evaluating the opinions of plaintiff's treating physicians. (Brief at 6-8).

(3) Plaintiff's impairment meets the requirements of a Listed Impairment. (Brief at 8-11).

The defendant argues that the Commissioner's determination is supported by substantial evidence in the record and must be affirmed.

## FACTS

This court adopts generally the facts contained in the plaintiff's brief under the heading "Statement of Facts" on unnumbered page 3 but only to the extent that the facts are historical and do not present the plaintiff's testimony as established facts. In

---

[1] Plaintiff's counsel has not numbered the pages of his brief, however, the court has referred to them as if they were numbered.

addition, this court adopts those facts only to the extent that they are consistent with the facts stated in this Report-Recommendation.

This court also incorporates the facts stated in the defendant's brief under the heading "Nonmedical Evidence" on pages 3 and 4.

## DISCUSSION

To be considered disabled, a plaintiff seeking disability insurance benefits or SSI disability benefits must establish that she is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months ...." 42 U.S.C. § 1382c(a)(3)(A).  In addition, the plaintiff's

> physical or mental impairment or impairments [must be] of such severity that [she] is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which [she] lives, or whether a specific job vacancy exists for [her], or whether [she] would be hired if [she] applied for work.

42 U.S.C. § 1382c(a)(3)(B).

The Commissioner uses a five-step process, set forth in 20 C.F.R. §§ 404.1520 and 416.920 to evaluate disability insurance and SSI disability claims.

> First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity.  If [she] is not, the [Commissioner] next considers whether the claimant has a "severe impairment" which significantly limits [her] physical or mental ability to basic work activities.  If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which meets or equals the criteria of an impairment listed in Appendix 1 of the regulations.  If the claimant has such an

impairment, the [Commissioner] will consider [her] disabled without considering vocational factors such as age, education, and work experience; ... .  Assuming the claimant does not have listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, [she] has the residual functional capacity to perform [her] past work. Finally, if the claimant is unable to perform [her] past work, the [Commissioner] then determines whether there is other work which the claimant can perform.

*Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982); *see* 20 C.F.R. §§ 404.1520, 416.920.

The plaintiff has the burden of establishing disability at the first four steps. However, if the plaintiff establishes that her impairment prevents her from performing her past work, the burden then shifts to the Commissioner to prove the final step. *Bluvband v. Heckler*, 730 F.2d 886, 891 (2d Cir. 1984).

1.    <u>**Scope of Review**</u>

In reviewing a final decision of the Commissioner, a court must determine whether the correct legal standards were applied and whether substantial evidence supports the decision. *Rosado v. Sullivan*, 805 F. Supp. 147, 153 (S.D.N.Y. 1992) (citing *Johnson v. Bowen*, 817 F.2d 983, 985 (2d Cir. 1987)).  A reviewing court may not affirm an ALJ's decision if it reasonably doubts whether the proper legal standards were applied, even if the decision appears to be supported by substantial evidence. *Johnson*, 817 F.2d at 986.  In addition, an ALJ must set forth the crucial factors justifying his findings with sufficient specificity to allow a court to determine whether substantial evidence supports the decision. *Ferraris v. Heckler*, 728 F.2d 582, 587 (2d Cir. 1984).

A court's factual review of the Commissioner's final decision is limited to the determination of whether there is substantial evidence in the record to support the decision. 42 U.S.C. § 405(g); *Rivera v. Sullivan*, 923 F.2d 964, 967 (2d Cir. 1991).

"Substantial evidence has been defined as 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Williams on behalf of Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988)(citations omitted). It must be "more than a scintilla" of evidence scattered throughout the administrative record. *Richardson v. Perales*, 402 U.S. 389, 401 (1971)(quoting *Consolidated Edison Co. v. NLRB*, 197 U.S. 229 (1938)).

"To determine on appeal whether an ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining the evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Williams*, 859 F.2d at 258. However, a reviewing court cannot substitute its interpretation of the administrative record for that of the Commissioner if the record contains substantial support for the ALJ's decision. *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972). *See also Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982), *cert. denied*, 459 U.S. 1212 (1983).

## 2.   **Medical Evidence**

On February 20, 2002, plaintiff was injured as a result of her car being hit in the rear end by a truck. (T. 117)(emergency room records). As a result, plaintiff was taken by ambulance to the emergency room of a local hospital. *See* (T. 112-17). A CT scan taken at the emergency room showed no fractures at Levels C4 through T1 of plaintiff's spine, showed no degenerative changes, and no paravertebral swelling, but did suggest a mild to moderate disc bulge at Level C5-6 of plaintiff's spine. X-rays taken on the same day of plaintiff's thoracic and cervical spine showed a mild compression fracture at Level T7 with minimal spondylitic changes, (T. 120), and no

evidence of fracture and no abnormality in plaintiff's cervical spine.  Plaintiff returned to the emergency room on March 12, 2002, but the records state that she left prior to being examined. (T. 97).

Following that initial treatment, plaintiff received follow-up care from her primary care physician, and as a result of continuing complaints of pain, numbness and other problems, plaintiff was referred to many specialists, including neurologists, neurosurgeons, orthopedic surgeons, and a physiatrist. (T. 89-91)(plaintiff's list of physicians).  The record contains detailed reports from these physicians who examined all aspects of plaintiff's complaints and administered physical examinations and specialized testing, in addition to x-rays, magnetic resonance imaging (MRI) tests, and nerve conduction studies.

One of the first specialists who examined plaintiff was Dr. Frederic Fagelman, who examined plaintiff during April of 2002. (T. 127-28).  Dr. Fagelman recorded all of plaintiff's complaints, and after a thorough examination, concluded that there were no radicular findings and that plaintiff was neurologically normal with a depressed reflex in her left biceps muscle.  Dr. Fagelman found no motor or sensory loss and no myelopathy.  Dr. Fagelman stated that an MRI showed a herniated disc at C5-6. (T. 127).  Dr. Fagelman also noted that plaintiff had suffered a "whiplash" injury "a number of years ago", but had not had any symptoms "in between". (T. 127).  He concluded that plaintiff was a candidate for an anterior cervical discectomy and fusion.  (T. 127).  However, with respect to surgery, Dr. Fagelman also stated that

plaintiff "had a lot of things to think about", and he gave plaintiff an appointment for the following month. (T. 127).

In July of 2002, plaintiff was treated by Dr. Shawn Jorgensen, a specialist in rehabilitation medicine. (T. 128-31). Dr. Jorgensen reported that plaintiff was getting relief from ibuprofen and that her whiplash did not appear to be the usual type since plaintiff appeared to have cervical protrusion. (T. 131). Dr. Jorgensen discussed surgery with plaintiff, but he believed that it was not necessary at that time, and that plaintiff should wait at least six months prior to making a decision about surgery. (T. 128, 131). Dr. Jorgensen believed that there was a good likelihood that plaintiff's condition would improve without surgery 60% within one year and an additional 32% in the year following. Dr. Jorgensen concluded that plaintiff was mildly to moderately disabled but could work without restrictions. (T. 131).

Dr. William Byrt, an orthopedist, treated plaintiff between March of 2002 and April of 2003. (T. 140-144). During plaintiff's initial visit on March 5, 2002, plaintiff complained of neck pain and neck swelling, but did not complain of weakness or numbness in her upper extremities. Dr. Byrt's assessment was that plaintiff was a "healthy young female in no obvious discomfort". (T. 144). Dr. Byrt found mild paracervical muscular tenderness but the remainder of his findings were normal. (T. 144). Dr. Byrt assessed plaintiff's condition as a cervical sprain, a "questionable" new fracture at the seventh thoracic vertebra, and a cervical disc protrusion at Level C5-6, without neurologic compromise. (T. 144).

Plaintiff's gait and stance were normal, including "toe walk and heel walk." (T. 144).  At that time, plaintiff exhibited no weakness, numbness, or paralysis of the upper extremities. (T. 144).  There was **mild** paracervical muscular tenderness extending into the mid-line at C6-7. (T. 144).  Plaintiff's flexion and extension were two thirds of normal with complaints of neck pain. *Id.*  Dr. Byrt recommended that plaintiff continue physical therapy to improve her range of motion.  (T. 144).

Nine days later on March 14, 2002, Dr. Byrt examined plaintiff who complained of sharp pains in her chest.  His physical examination was the same as his examination on March 5, 2002, and his assessment was that plaintiff had a thoracic sprain.  He again recommended a general exercise program. (T. 143).

The record shows that Dr. Byrt examined plaintiff again on October 10, 2002, and his notes indicate that plaintiff "has had multiple additional evaluations".  (T. 142).  Dr. Byrt reviewed MRIs of plaintiff's cervical and thoracic spine and interpreted them as showing a cervical disc protrusion at Level C5-6 with no neurologic compromise, and a degenerative thoracic disc at Level T7-8.  Dr. Byrt noted no obvious discomfort while plaintiff was sitting. (T. 142).  At that time, plaintiff did **not** complain of numbness or paralysis. (T. 142).

About one month later on November 19, 2002, Dr. Byrt commented that plaintiff had seen Dr. Moberg for pain management and that **plaintiff told Dr. Byrt** that Dr. Moberg "declined" the steroid injection because of "bony spurs and compromised space in the spinal canal." (T. 141).  However, Dr. Byrt noted in his report that he spoke with Dr. Moberg, and Dr. Moberg had been concerned with

8

plaintiff's claim of urinary incontinence, but Dr. Moberg was perfectly willing to proceed with epidural steroid injections. According to Dr. Byrt, Dr. Moberg did **not** have hesitancy about the epidural injections and did not state the concerns attributed to Dr. Moberg by the plaintiff. (T. 141). Dr. Byrt recommended that plaintiff proceed with the epidural injections. (T. 141).

The final report from Dr. Byrt in the record is dated April 22, 2003, and he noted that according to plaintiff, the first epidural injections gave relief for only two weeks, and she stated that the final epidural injection did not give any significant additional relief. (T. 140). The court notes that the statements by the plaintiff to Dr. Byrt about the pain relief from the epidural steroid injections are inconsistent with the plaintiff's statements reflected in Dr. Moberg's notes. In Dr. Moberg's notes, he states that according to plaintiff, the injections relieved her pain 25% (T. 133), 50% (T. 132), and at one point removed all of her pain (T. 132).

Plaintiff treatment with Dr. Paul Moberg, began in October of 2002. He administered the epidural steroid injections between October, 2002 and March of 2003. (T. 132-137). Dr. Moberg noted that plaintiff had already been examined by Dr. Fagelman and two other specialists, Dr. Semenoff and Dr. Byrt. (T. 136). Dr. Moberg's first examination noted that plaintiff had tried physical therapy, chiropractic treatment, traction, and electrical stimulation plus oral medications. (T. 136). Dr. Moberg stated that another specialist, Dr. Byrt, had recommended cervical epidural injections. Dr. Moberg administered the steroid injection on January 2, 2003, and

9

stated that plaintiff tolerated the procedure and noted that her pain "abate[d]" following the procedure. (T. 134).

In a follow-up visit in late January 2003, Dr. Moberg again wrote that plaintiff stated that her pain symptoms decreased following the first steroid injection and he recommended a second injection. (T. 133). The second epidural injection was administered on January 23, 2003. (T. 133). On March 18, 2003, plaintiff received a third steroid injection and stated to Dr. Moberg that her pain symptoms had *completely abated*. (T. 132). Dr. Moberg also noted that after plaintiff's second steroid injection, she noted a marked decrease in her neck and arm pain and had not had any arm pain until she sat in a dental chair for 45 minutes. (T. 132). In addition, he wrote that plaintiff stated that she had a 50% decrease in neck pain following the second steroid injection. (T. 132). As stated above, Dr. Moberg concluded during the March 20, 2003 visit that plaintiff had an *overall decrease in her neck pain of 50%*, and that the third epidural had completely eliminated plaintiff's pain after the injection. (T. 132).

On November 5, 2002, plaintiff told Dr. Moberg that over the past four weeks, she had some urinary incontinence, but that her primary care physician told her that this was due to childbirth. (T. 136). Plaintiff had described the symptoms to Dr. Byrt as "some very small urine leaks" when she went for occasional walks, but had "no frank soiling of herself." (T. 141). During Dr. Moberg's January 7, 2003 examination, the February examination, and also the March 20, 2003, he noted that plaintiff had *no*

*complaints about urinary incontinence*. (T. 134, 133, 132).  These notes are contrary

to plaintiff's reports to other physicians and contrary to her testimony.

On May 5, 2003, plaintiff consulted a different orthopedist, Dr. Robert A.

Cheney. (T. 145-46).  Dr. Cheney did not have any unusual findings when examining

plaintiff.  (T. 145-46).  He did note that the MRI showed a disc herniation at C5-C6

and a disc protrusion at C4-5.  Dr. Cheney noted that plaintiff was only in a "mild"

amount of distress. (T. 145).  Dr. Cheney discussed the possibility of surgical

intervention which would result in a cervical diskectomy and fusion.  (T. 146).

On April 23, 2002, plaintiff was examined by Dr. David Semenoff, a

neurosurgeon in the Albany area.  Dr. Semenoff performed a thorough examination

which resulted in mostly normal findings in terms of strength, mobility, reflexes and

flexion, and also reviewed the MRI of plaintiff's thoracic spine, which Dr. Semenoff

found to be "quite unremarkable". (T 150).  Dr. Semenoff interpreted the MRI of

plaintiff's cervical spine as showing an annular tear at Level C5-C6, plus a possible

bulge of a disc at that level. (T. 150).  Dr. Semenoff concluded that plaintiff's

symptoms are related to a cervical strain/sprain and recommended conservative

treatment. (T. 150).

Plaintiff returned to Dr. Semenoff one year later on May 13, 2003. (T. 147).  Dr.

Semenoff found a restricted range of motion in plaintiff's cervical spine. (T. 147).  In

addition, his review of the MRI showed some degeneration at Level C5-C6 and some

bulging. (T. 147).  Dr. Semenoff commented that plaintiff was concerned that he did

not suggest surgery when other physicians did.  He specifically stated that in his

opinion, the surgery at plaintiff's young age might result in some different type of disease at adjacent levels of her spine. (T. 148).  He stated that he did not think that surgery was a "reasonable treatment option for her" and that "[s]he will probably have to learn to live with her symptoms." (T. 147).

On August 29, 2003, plaintiff was examined by Dr. Darryl DiRisio, an Assistant Professor of Surgery and a neurosurgeon at Albany Medical College. (T. 203-204). After an examination, Dr. DiRisio believed that plaintiff had spondylosis at the cervical spine and did not believe that surgical intervention was necessary at that time. (T. 204).

Plaintiff was also examined by Dr. Robert Block, an orthopedist in Bennington, Vermont.  Dr. Block examined plaintiff several times between June and September of 2003. (T. 197-202).  Dr. Block found *excellent flexibility* in her cervical spine but discomfort on neck extension and extremes of rotation. (T. 201).  He found diminished sensation in plaintiff's left index finger but normal and intact knee jerk and ankle jerk reflexes.  Dr. Block reviewed plaintiff's MRIs and found several degenerative thoracic discs without any neural impingement.  Dr. Block's impression was that plaintiff had a cervical disc injury that was healing but had some neurologic impingement. (T. 201).

During July of 2003, Dr. Block again concluded that plaintiff was improving with very mild findings, including a small central disc rupture at C5-6.  Dr. Block concluded that plaintiff should obtain new cervical and thoracic MRIs and that plaintiff would most likely benefit from a cervical diskectomy. (T. 198).  During plaintiff's September 2, 2003 examination, she reported that she had *no difficulty* with

12

bowel or bladder habits, except for some "occasional" problems with dribbling. (T. 197).

During December of 2003, plaintiff sought an opinion from Dr. James Wymer for her left-sided numbness and muscular strain. (T. 216).  Dr. Wymer performed a thorough neurologic examination including investigation into cranial nerves and nerve tests for nerve function. (T. 218).  Dr. Wymer concluded that the nerve conduction studies and brain studies were within normal limits, and he believed that plaintiff had *mild* disc disease and paraspinal spasm which was producing pain on plaintiff's left side. (T. 218).

During March of 2004, plaintiff was again examined by Dr. Wymer, who performed neurologic testing. (T. 211).  Dr. Wymer's impression was that plaintiff's left-sided pain and numbness symptoms were likely from a muscular strain, having both physiologic and non-physiologic components.  According to Dr. Wymer, plaintiff "... appears to have had an excellent recovery", and he did *not* find objective evidence for persistent deficits. (T. 212).

In June of 2004, plaintiff was examined by a physiatrist, Dr. Lynne Nicolson. Dr. Nicolson examined plaintiff's medical history and all aspects of her cervical range of motion.  (T. 231-232).  Dr. Nicolson concluded that she agreed with Dr. Wymer's working diagnosis and recommended that plaintiff continue with a home exercise program on a regular basis. (T. 232).

3.    **Pain and Credibility**

"An [ALJ] may properly reject [subjective complaints] after weighing the objective medical evidence in the record, the claimant's demeanor, and other indicia of credibility, but must set forth his or her reasons 'with sufficient specificity to enable us to decide whether the determination is supported by substantial evidence.'" *Lewis v. Apfel*, 62 F. Supp. 2d 648, 651 (N.D.N.Y. 1999)(quoting *Gallardo v. Apfel*, No. 96 CIV 9435, 1999 WL 185253, at *5 (S.D.N.Y. March 25, 1999)).  To satisfy the substantial evidence rule, the ALJ's credibility assessment must be based on a two step analysis of pertinent evidence in the record.  *See* 20 C.F.R. §§ 404.1529, 416.929; *see also Foster v. Callahan*, No. 96-CV-1858, 1998 WL 106231, at *5 (N.D.N.Y. March 3, 1998).

First, the ALJ must determine, based upon the claimant's objective medical evidence, whether the medical impairments "could reasonably be expected to produce the pain or other symptoms alleged...."  20 C.F.R. §§ 404.1529(a), 416.929(a). Second, if the medical evidence alone establishes the existence of such impairments, then the ALJ need only evaluate the intensity, persistence, and limiting effects of a claimant's symptoms to determine the extent to which it limits the claimant's capacity to work. *Id.* §§ 404.1529(c), 416.929(c).

When the objective evidence alone does not substantiate the intensity, persistence, or limiting effects of the claimant's symptoms, the ALJ must assess the credibility of the claimant's subjective complaints by considering the record in light of the following symptom-related factors: (1) claimant's daily activities; (2) location,

14

duration, frequency, and intensity of claimant's symptoms; (3) precipitating and aggravating factors; (4) type, dosage, effectiveness, and side effects of any medication taken to relieve symptoms; (5) other treatment received to relieve symptoms; (6) any measures taken by the claimant to relieve symptoms; and (7) any other factors concerning claimant's functional limitations and restrictions due to symptoms.  *Id.* §§ 404.1529(c)(3), 416.929(c)(3).

Plaintiff argues that the ALJ failed to give appropriate weight to plaintiff's complaints of pain. (Brief at 5).  The record supports the ALJ's finding that the plaintiff's symptoms are overstated.  The opinions from the large number of orthopedic physicians, neurologists, and neurosurgeons do not show solid objective evidence that supports plaintiff's complaints of debilitating pain and incapacity. Plaintiff's statements to various doctors are widely discrepant, and the record shows that plaintiff claims urinary incontinence to some physicians, yet denied urinary incontinence to Dr. Moberg and Dr. Block .  (T. 132, 197).

In addition, plaintiff stated to Dr. Moberg that the epidural steroid injections reduced her pain by 25%, 50%, and at one point eliminated all of her pain, yet in reporting the results of those injections to other physicians, plaintiff denied that they afforded substantial relief and in some cases denied that they afforded any pain relief. Plaintiff's counsel states that the all the doctors' reports support plaintiff's complaints of pain. Brief at 5.  The doctors do note that plaintiff has pain, and the ALJ does not dispute that she has pain, however, he finds that her pain would not prevent her from performing the sedentary work with the limitations that the ALJ described to the

15

Vocational Expert.  The record also contains statements by physicians such as Dr. Wymer who could find no objective basis or physiological basis for plaintiff's complaints of pain and disability.  Thus, the ALJ's determination that plaintiff's degree of pain would not prevent her from performing substantial gainful activity is supported by substantial evidence.

**4.    Treating Physician**

The medical conclusions of a treating physician are controlling if well-supported by medically acceptable clinical and laboratory diagnostic techniques and are not inconsistent with the other substantial evidence in the record.  20 C.F.R. §§ 404.1527(d)(2); 416.927(d)(2).  *See also Schaal v. Apfel*, 134 F.3d 496, 503 (2d Cir. 1998); *Rosa v. Callahan*, 168 F.3d 72, 78-79 (2d Cir. 1999).  An ALJ may not arbitrarily substitute his own judgment for competent medical opinion.  *Rosa v. Callahan*, 168 F.3d at 79 (citations omitted).   If the treating physician's opinion is not given "controlling weight," the ALJ must assess the following factors to determine how much weight to afford the opinion: the length of the treatment relationship, the frequency of examination by the treating physician for the condition(s) in question, the medical evidence supporting the opinion, the consistency of the opinion with the record as a whole, the qualifications of the treating physician, and other factors tending to support or contradict the opinion.  20 C.F.R. §§ 404.1527(d)(2-6); 416.927(d)(2-6).  Failure to follow this standard is a failure to apply the proper legal standard and is grounds for reversal. *Barnett v. Apfel*, 13 F. Supp. 2d 312, 316 (N.D.N.Y. 1998) (citing *Johnson v. Bowen*, 817 F.2d at 985).

Plaintiff argues that the ALJ failed to give proper weight to the conclusions of plaintiff's treating physicians. The record contains an overwhelming amount of medical evidence but very little evidence to support the view that plaintiff's impairments were disabling. Of the numerous specialist physicians who examined the plaintiff, ***none*** suggested that she was unable to work at any job, and in fact, Dr. Jorgensen believed that plaintiff was "mildly to moderately disabled" but was able to work. (T. 131). Dr. Wymer also believed that plaintiff was able to work since he found her only temporarily and partially disabled (T. 226), and believed she could sit for 8 hours, stand for 3 hours, and walk for 1 hour in a total work day. (T. 227). He also found that she could lift ten pounds occasionally and up to five pounds frequently. (T. 227). More than that is ***not*** required for sedentary work. *See* 20 C.F.R. §§ 404.1567(a), 416.967.

Plaintiff was treated for many years by Dr. Neil Trachtman  (T. 154-84), yet there is no opinion whatsoever from this long-term treating physician about plaintiff's disability. There is substantial evidence in the record to support the ALJ's conclusion about plaintiff's medical condition, and his finding about plaintiff's ability to perform certain jobs enumerated by the Vocational Expert is fully supported by substantial evidence in the record.

## 5.  <u>Listed Impairment</u>

Plaintiff's third point purports to be an argument that plaintiff meets the requirements of a listed impairment. However, this point contains also an argument regarding exertional and non-exertional limitations. The court would point out that

pain itself is not necessarily a "non-exertional" impairment.  The Second Circuit has cited the Social Security regulations in defining  "exertional" limitations as limitations and restrictions imposed by impairments and related symptoms such as pain that affect only the ability to meet the strength demands of jobs such as sitting, standing, walking, lifting, carrying, pushing and pulling. *Butts v. Barnhart*, 388 F.3d 377, 381 (2d Cir. 2004)(citing 20 C.F.R. § 416.969a(b)).

Non-exertional limitations are those limitations and restrictions imposed by impairments and related symptoms such as pain that affect only the ability to meet the demands of jobs ***other than strength demands.*** *Id.* (citing 20 C.F.R. § 404.969a(c)). *See also* 20 C.F.R. § 404.1569a(c).  The regulations refer to pain as a "symptom" that can lead to exertional or non-exertional limitations.

Plaintiff argues that in addition to pain, she experiences numbness, vertigo, and unpredictable incontinence.  The medical evidence simply does ***not*** support the extent of plaintiff's claims of these "non-exertional" impairments.  None of the treating or examining physicians noted that plaintiff complained of vertigo two to three times per week, and none of the physicians noted that plaintiff complained of any more than occasional dribbling with respect to incontinence.  Finally, although it is true that plaintiff experiences numbness, there is no indication from any medical source that this would prevent her from performing any gainful or substantial gainful activity. Thus, plaintiff's non-exertional impairments would not prevent her from performing work in the national economy.

In any event, the ALJ considered plaintiff's additional limitations by obtaining the testimony of a Vocational Expert, who testified at the hearing.  The ALJ was careful to explain all of plaintiff's additional limitations that would restrict the range of sedentary work of which plaintiff was capable.  In fact, the ALJ added additional restrictions that the doctors did not even note.  Thus, the ALJ properly considered plaintiff's non-exertional impairments.

Plaintiff also argues that she meets the listed musculoskeletal impairment in 20 C.F.R. § 404, Listing 1.00 since she suffers from a degenerative process and herniated disc.  Plaintiff argues that she suffers from a degenerative process and cites to the section of the listing which specifies the sources of impairments of the musculoskeletal system.  The section plaintiff cites, however, is not a Listing in itself, it is merely the introduction to the musculoskeletal listings section, a description of how the musculoskeletal listings are evaluated, and the definitions of terms that are used in the listings. 20 C.F.R. Part 404, Subpt. P., App. 1 § 1.00.  The category of Musculoskeletal Impairments which actually contains the requirements for listed impairments begins with § 1.02 and ends with § 1.06.

Even the section cited by plaintiff does not coincide with plaintiff's impairment. Counsel claims that plaintiff has degenerative disc disease and a soft tissue injury. Brief at 10.  However, the second part of the sentence requires that soft tissue injury (allegedly plaintiff's whiplash) to be accompanied by prolonged periods of immobility or convalescence.  Plaintiff has not suffered from a prolonged period of immobility or convalescence.  Additionally, according to the section that discusses degenerative disc

19

disease, the issue is what is the ***extent*** of any degenerative process not simply whether an individual has some sort of degenerative process. *Id.* § 1.04.  This section requires evidence of nerve root compression with limitation of motion of the spine, motor loss (atrophy with associated muscle weakness), accompanied by sensory or reflex loss.

Plaintiff cites to the opinions of Dr. Semenoff, Dr. Fagelman, and Dr. Byrt.  In October of 2002, however, Dr. Byrt noted no neurologic compromise. (T. 142).  In June of 2003, there was no neurologic impingement in the thoracic area, and although there was some impingement in the cervical area, plaintiff had excellent flexibility of the cervical spine and excellent mid and low back flexibility with full straight leg raising. (T. 201).  Dr. Semenoff also did not find any significant "neuro compression at any of the levels" in either his April 23, 2002 examination or his May 13, 2003 examination. (T. 147, 150).  In April of 2002, Dr. Fagelman stated that there were no radicular findings. (T. 127).

Plaintiff does not cite to any opinion of her long-time treating physician, Dr. Trachtman, and does not cite to the many other opinions in the record which stated that plaintiff's pain was mostly likely from a muscular strain. (T. 211).  On December 11, 2003, Dr. Wymer noted that plaintiff had a left-sided pain and numbness syndrome, but stated that might represent chronic muscular strain. (T. 218).  In addition, the examination of physiatrist, Dr. Nicolson concurred with Dr. Wymer that plaintiff should be involved in a home exercise program and that no surgery was recommended.  (T. 230-232).

20

Although the doctors cited by plaintiff have mentioned degenerative disease, there is no statement that the degenerative disease has advanced to a point that is very serious or disabling. Dr. Semenoff when commenting on the MRI of plaintiff's thoracic spine stated that it was "unremarkable" (T. 149), and recommended against surgery. The record therefore does not support plaintiff's arguments with respect to plaintiff being disabled by a listed impairment.

Plaintiff makes a similar argument that she has a loss of function because of soft tissue injuries in the form of a whiplash. Plaintiff cites the statement by Dr. Jorgensen which was during July of 2002. (T. 131). Again, the issue is not whether plaintiff experienced some type of injury, but whether that injury has a disabling effect on plaintiff's ability to function. However, a review of this report also shows that Dr. Jorgensen stated that he would only consider plaintiff "mildly to moderately disabled" and stated that she could "work without restriction." (T. 131). This certainly does not sound like an opinion that plaintiff could not perform "any" gainful activity, the severity that would be required for a Listed Impairment.

The treatment and multiple examinations by many specialists during 2003 and 2004 do not support the argument that plaintiff's soft tissue injury or whiplash met the requirements of a listed impairment. The most recent examinations by Dr. Wymer state that plaintiff appears to have had an excellent recovery and that there was no objective evidence for plaintiff's persistent deficits. (T. 211-15). Dr. Wymer's findings are confirmed by Dr. Lynne Nicolson, who agreed with Dr. Wymer's opinion and recommendation that plaintiff should be involved in some type of exercise

program. (T. 230-32).  Plaintiff's argument therefore is not supported by the medical evidence in the record.

WHEREFORE, based on the findings in the above Report, it is hereby

RECOMMENDED, that the decision of the Commissioner be AFFIRMED and the Complaint (Dkt. No. 1) be DISMISSED.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have ten days within which to file written objections to the foregoing report.  Such objections shall be filed with the Clerk of the Court.  FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW.  *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a), 6(e).

Dated: February 22, 2006

Hon. Gustave J. DiBianco
U.S. Magistrate Judge